Good morning, Your Honors. May it please the Court. Jahan Saghafi for the Plaintiffs. I'll reserve five minutes for rebuttal. The Plaintiffs respectfully request that the Court reverse the District Court's order granting Defendant Amos' early motion for summary judgment on standing. However, there are three distinct issues. One, standing. Two, whether plaintiffs state a claim. And three, preemption. The standard of review, of course, is de novo. I'll begin with the only question invited or addressed by the District Court, which is standing. Plaintiffs have standing because under California law, established prior to and reaffirmed in Quick Set, consistent with this Court's authority, injury under the UCL and FAL is satisfied by the purchase of a product in reliance on a misrepresentation. That's all that standing requires. Now – And you say Quick Set affirms this idea? Yes, Your Honor. Or sets it out? No, affirms it. It was – it's been a part of California jurisprudence in In Reap Tobacco II. It's been confirmed by this Court in Chavez and Gerber and Rubio. So there's a long tradition of allowing standing when there's an allegation that the product was purchased in reliance on a misrepresentation. What are you going to do with the idea that nobody alleges that they wouldn't have purchased another product, so therefore there is no financial remuneration which is lost? The harm occurs at the moment of purchase. And if you allege that you would not have purchased this product, the Court need not inquire – the law does not inquire into whether there's an adequate product elsewhere out there. So the entire market can be deceiving, and they can all be subject to liability. That's one possibility. That's irrelevant. That's beyond the scope of what standing inquires into and whether we state a claim as well. Because it's only – and Kwikset is quite clear about this, and other cases are as well. Well, it seems to me Kwikset is as clear as you have had it before under California law. It is quite clear. Because I waited for Kwikset on another standing issue. Yes. And now I've got Kwikset, I kind of hope I understand what California is saying. Well, I think it's quite clear. It's a very robust opinion. And to be honest, Justice Chinn's dissent is quite reminiscent of AMO's argument here, saying we don't think standing should exist in this type of case. We don't think plaintiffs can state a claim. Regardless, I'll emphasize that injury in fact under Article III depends on the invasion of a legally protected interest. And as we've been discussing, that legally protected interest is defined – its contours are defined by reference to the underlying substantive law. And so that's why we look to California law to understand what needs to be shown for a standing claim. Again, the challenge is on the deceptive marketing, not on whether there's a comparable product. And AMO represented that CMP disinfected, rejuvenated, and promoted healthy lens wear, but in reality left customers vulnerable to a dramatically increased risk of infection from acanthamoeba. It was so ineffective that it was eventually pulled from the market into recall. And in short, it's a safety product that's not safe. And that's exactly what the UCL and the FAL are aimed at addressing. I guess my worry with the California law is that in this particular instance, and I'm going right at lore. I mean, lore seems to be that particular precedent which we need to specifically adjudicate in this particular case. But in lore, it seems to me that what we're really looking at is we're looking at products which are not what they say they are. And in this particular situation, we're looking at a product which went through the testing that the government said is necessary, and therefore were allowed to say the words that they said, and now we're suggesting that that's misleading. Okay. Now we've switched into preemption. We have. Okay. I just wanted to make sure. Well, I'll be back to the other issue. That's fine. But it seems to me the first issue is the preemption there. Certainly. Well, I think that Regal makes clear that lore is a different kind of circumstance. In lore, there's no preemption because it's only 510K clearance. It's meant to be substantially equivalent. The FDA is not analyzing safety and effectiveness, let alone the adequacy of the representations. In Regal, you have a different scenario because you go through the very rigorous premarket approval that requires 1,200 hours, on average, of analysis, and it has the force of law. Under RiverRunners and under lore in Regal, there's no requirement here. That's the key for preemption. There is some requirement, wouldn't you say, because it isn't a requirement that you say certain things on your label, which might get me to papity, or it isn't something that suggests that I have to do certain things or I have to say certain things. It isn't a negligence claim. It isn't a failure to warn claim. What it is is it is a certain standard at which one can say it disinfects. The FDA is not saying that. The FDA is saying there are certain things you can do that are optional that it sets forth in the guidance document. It repeatedly says that, and the FDA has regulations saying that guidance documents are not binding. They don't have the force of law. I understand that, but they won't let them even be sold unless they meet a certain standard after which they can say it disinfects. It needs to go through certain tests to show that it's substantially equivalent to other products on the market. But it's not saying you can say it rejuvenates. It's not saying you can say that it supports healthy lens wear. It's saying this falls into the category of disinfecting solution, so we know what we're talking about when we're looking at your stack of papers for 20 hours and rubber stamping it and allowing you to get into the market. But it's not confirming labeling, and it says separately, you need to make sure you comply with regulations on labeling that are not our business, and that's not what the FDA is for. The FDA is about safety and getting products to market. It's not about how they're marketed. So I don't know. The regal is clear that — well, sorry. The statute, section 360K, is clear that there needs to be a federal requirement, and regal distinguishes premarket approval, which has requirements, which we don't have here, from 510K clearance, which is substantial equivalence, which is not requirements. So then the only question from PAPICA is, okay, if you're in 510K clearance, which is what PAPICA was, is there some actual requirement? Because 510K is not going to provide that, so let's go look somewhere else. The only other place we can go is regulations. So in PAPICA, the tampon warnings were five paragraphs of very clear, detailed warnings that were required by a regulation that went through notice and comment as the force of law. Here, we don't have that. We just have some sample language that industry and the FDA came up with to identify what the product does, and it happens to mention the word disinfect. It doesn't say anything about rejuvenate. It doesn't say anything about this packaging is okay. It doesn't say anything in any detail, and it doesn't have the force of law. So I think under PAPICA, again, we find no preemption because there's nothing that has the force of law. There's no requirement set forth by the FDA. And I think that's very clear from the line that's drawn between Regal and Lore. It's clear from the FDA in 21 CFR 10.115. It says, Guidance documents don't establish legally enforceable rights or responsibilities, and firms are not required to follow a guidance document, and this Court affirmed that notion in River Runners. It also says at the excerpt of Record 194, the labels are not required to say anything specific. It only requires material, submission of material sufficient to describe the device, its intended use, and its directions for use. So it's just requiring the company to tell it what we're talking about so we can figure out what is it substantially equal to, substantially equivalent to. It's not saying we want to parse the wording of your representations to determine if your marketing campaign is deceptive or not. But if, in fact, it doesn't meet the minimum standard, can they suggest that it disinfects? And claim preemption? Well, my worry about this is this. If, in fact, one has to, though one doesn't need to go through all of the tests that are recommended by the FDA, one can use an alternative method by which one can get there. But having secured the FDA's approval, one can suggest that it disinfects. Then is there preemption? Okay, I'd like to focus on your use of the word approval. There's no approval here. There's clearance. Well, what's clearance? If you don't get clearance, you don't sell. Right, okay. But it's a different type of approval. I understand, but I'm just trying to put it in the same vernacular that I saw Lohr. I'm trying to put it in the same kind of a situation, because Lohr had absolutely no regulation, nothing. There is regulation here. We have a guideline, and that guideline is established. All I'm trying to determine is, does that guideline have any force to it? Yes. And bottom line, if there is some force, and if one cannot even sell, if one doesn't meet the applicable guidelines, has one sufficiently regulated it such that we can't have any state regulation in those cases? So implied preemption, you're talking about. Right. Conflict preemption. Right. So the question then is, is it impossible to comply? No. AMO can run the tests, can submit the marketing that it chooses to develop, and it can say it can either make its product better so that it doesn't expose people to this risk, or it can divulge the real risks that people face in using this product as opposed to other products. And it can go through 510K clearance. It could even choose to go through the more rigorous PMA approval if it wants to, and it could satisfy those requirements. So complying with both the state law duty of honesty with customers and compliance with the FDA clearance process or approval process is very much possible. So there's no impossibility under that aspect of conflict preemption. And the other question is, does it frustrate the objectives? The objectives of the FDA generally and in Congress in passing 360K and the medical device amendments generally is to ensure customer safety. And then more specifically with respect to this guidance document, it's just to provide a pathway to get a product to market, not to worry about its advertising, not to worry about what it says on TV, what it says on the shelves, what it says on the box. They're not focused on that. So I don't think it can be credibly said that requiring honesty in divulging the risks is at all frustrating the objectives of the FDA in trying to ensure customer safety. I've gone over my time, so I'll reserve the rest for rebuttal. Thank you, Your Honors. Your Honors, Ben Whitwell from Venable on behalf of Advanced Medical Optics. To address a question that you were just discussing with opposing counsel, if the product did not meet the FDA test requirements to be labeled as a disinfecting solution, it could not have used the word disinfect. On the record on summary judgment, there was no dispute. It was established that it met the FDA standards, meaning that it was in fact tested to kill the five panel organisms at the required levels designated by the FDA to be labeled as a disinfecting solution. But aren't you really suggesting then that if the FDA suggests it can be sold as a disinfecting solution, that one should rule as a matter of law that that is in fact then not misleading? As to the? As to disinfecting? As to the use of the word disinfect, yes, I would, Your Honor. I would say that? What rule do I have or what case do I have that would suggest that? Well, one case would be the Tuttle versus Seba case which is cited in our briefs, that specifically on this, not on this product, but on another contact lens solution, look to the guidance document to find preemption. But it goes beyond just preemption. What you have here is essentially a very simple generic representation. It's a contact lens cleaning solution. What do they say we represent about it? It cleans and disinfects. It's like saying it's safe and reliable. What you have is a basic product description that is got to have some standard for which we can feel comfortable of describing our product really as just a contact lens cleaning solution. The FDA provides that standard. We go through enormous cost, expenditure, and time to perform the test that the FDA says we should perform. The FDA doesn't say anything about Acanthamoeba. And it goes, again, even beyond that. This is more like a product defect case that they're alleging. They don't claim that our product is not a disinfectant. What they say is, and they say this over and over in their briefs, is that it is a less effective disinfectant than its competitors, and specifically that it is less effective because more people got this one particularly rare corneal infection known as Acanthamoeba keratitis. So essentially what they're saying is that the product has exposed people to the potential for harm, to the potential for getting Acanthamoeba keratitis. Just like in cases like American Suzuki and Firestone tires, driving that car exposed you to the potential of a rollover. Riding on those tires exposed you to the potential of a flat, or a flat that could lead to an accident. Here you've got people who use the product, and the alleged defect actually manifested itself. They got the infection. Those people have brought tort claims across the country. Those claims are being adjudicated. Those claims are being resolved literally even as we speak. Both our firms are involved in those tort cases. This is really just a tag-along class action. This is, okay, there's been a recall. The product has this alleged defect. And they'll say, I wouldn't have bought it if I'd known about that defect. No different from Suzuki. I wouldn't have bought it if I'd known about the propensity to rollover. I wouldn't have bought the tires if I'd known of their propensity to explode. But these are all the people who used the product, finished the product, discarded the bottle, and never, never manifested the alleged defect, which is getting the eye infection in question. But yet now, after the fact, want their money back, all of their money back, for that product they used to completion. This is no different from those cases. And I want to spend a moment now on Kwikset and Chavez, which are both product designation of origin cases. In the case of, let's focus on Chavez since it's a Ninth Circuit case. Chavez was water that was bottled in New Mexico, that was not bottled in New Mexico, but was labeled as being bottled in New Mexico. And this Court said that because the plaintiff alleged that he would not have purchased it if he had known it was not bottled in New Mexico, the fact that it was perfectly fine water, that he drank it and it hydrated him, didn't deal, essentially, with that issue of a specific misrepresentation that had value to the plaintiff, and the plaintiff did not get that incremental value that related to that specific misrepresentation. That case is completely different from the case that we have here, in that that water case would be similar to our case if it was, that the product had been treated, for example, with something to clean it, and that a very, very small percentage of the product, and they said it's safe water, you can drink it, it's healthy, it's good for you, those kinds of generic representations. The product, in fact, would have, the water in this example, would have caused one in 10,000 people to get very sick or even die. Everybody else comes in after the fact who didn't get very sick or very die and says, well, I wouldn't have bought that water if I had known it was exposing me to this risk. They're saying the same thing here. I wouldn't have bought that contact lens cleaner if I had known that it was exposing me to this risk. That is why the California courts have consistently said no. You can't have a product defect case unless the defect manifests itself for you. And to read the UCL as changing that fundamental rule would essentially create a California state law cause of action with federal court and national jurisdiction for national class actions every single time there's a recall. Because what recall product would you not be able to say to consumers, well, if you'd known that Prius could accelerate out of control, would you have bought it? Well, no, I wouldn't have. All those cases are going to be here. And that's what we have to prevent, I believe. Well, my worry is not so much our case but Kwikset after that. I mean, I've read Kwikset. I had to read it up based on another case that I had, which I wasn't sure they had standing. Now, having read Kwikset, distinguish this case from Kwikset. Seems to me Kwikset is dead on. Your Honor, Kwikset is not dead on because, again, and that's why I mentioned Chavez, it is a designation, a product designation of origin. For a lock set to be a lock set and to be described as a safe and reliable, effective lock set, it doesn't have to say anything about being made in the USA. Why do you say it's made in the USA? Why do you put that on there? Because you know that there are people who will pay extra, and they even say directly in the opinion that the damage, the injury is the difference in price between what the person would have paid with or without the misrepresentation. So the court essentially acknowledges that there are people who will pay extra for or will choose based on and pay extra for something that is made in the USA. That representation, unlike this case, didn't have to be made. You really can't sell a contact lens cleaning solution without saying it cleans and disinfects. It's inherent in the product itself. It doesn't have to be made. It was clearly false. Here, it's not clearly false because the FDA defines what a disinfectant is, and we met that standard, and has unique value separate from the value of obtaining a working lock set. None of those factors are true here, and I think why you can distinguish Kwikset from this case and Kwikset from Chavez. And I'll also just point out a couple of other things on Kwikset. Kwikset was decided on a DMER standard. So here, summary judgment, there's already, and the plaintiffs admit this, there's already been a dispute of finding a fact that the plaintiffs would have used another solution, didn't pay any extra for our solution. So there's no incremental difference, the kind of difference they referred to in Kwikset. And let's see, there was another point with respect to that. Oh, yes. In the Prop 64 statute, it points back to federal court Article III standing, and even Kwikset cites Article III cases. So the ultimate arbiters of what Article III standing is is the federal courts, not the California Supreme Court. So even if you found it troubling, if you will, it's not binding as a definition of what constitutes Article III standing. Okay. Anything else? Not unless there are any further questions, Your Honors. Any questions? No. I'll say, I think you've got a close case on this issue, though. I don't have much doubt how it's going to come out if it goes back. It's just you may have jumped the gun. In what sense, Your Honor? Well, you've got the judgment a little prematurely. Before the Kwikset decision, you mean? Well, before you – before there were a little more proceedings in the district court, that's all. Your Honor, I – That's just a comment. I'm thinking about it. You make a good argument. You may be right, but it's close. I understand, Your Honor. I think that this was one where the district court judge felt that there might not be standing and asked us to bring an early summary judgment motion. I think she wanted to get rid of it. Maybe her instincts were right, but. I'd like to say, Your Honor. But. Thank you. Thank you. Your opponent made a pretty good case. Do you have a reply to it? Well, I think Your Honor's point that the judge got rid of the case somewhat casually is certainly on. She did not cite any authority. She didn't delve into what the California courts think about UCL or what the Ninth Circuit does. And then she also did not invite the other two issues. So I think it would be appropriate for this Court to remand to her to get, in the first instance, address those questions. You're an optimist keeping on with the case, though. Well, you know, when I first heard about this case, I was a little bit skeptical. And once I read the authority on deceptiveness in UCL and saw that, for example, in the Levy case, there was a 13-day trial on the question of whether a leave is gentler on your stomach than aspirin, and obviously that is an actionable claim. I realized that when you look at the actual standards for standing, for standing a claim, and for preemption, it's actually not that hard a case. I agree that a jury could go either way. We could lose on summary judgment. But under Rubio and Haskell v. Time and all these other Ninth Circuit and California appellate cases, we have the opportunity to present evidence in the record, surveys of customers, expert testimony, what have you. And obviously at this early stage, we're not there yet. How do you deal with the analogies that your opponent suggested of all the cases that could be brought where there is some defect, but the people bringing it didn't suffer it? Well, I think that's a perfectly astute analysis of warranty law. And it's perfectly appropriate for product defect cases. It's not appropriate for UCL cases. And let me point the Court to Henry Toyota in the Central District of California, which came out November 30th of this past year. It's 2010 Westlaw 4867562. There's a really good analysis by Judge Selnai, I believe it is, on the distinction between product defect cases and UCL claims. And he allowed the plaintiffs to go forward where there they allege that the cars are not safe because and that's there was a misrepresentation about the safety of the cars because they have a sudden acceleration, a sudden acceleration problem. Most people didn't suffer the sudden acceleration problem. But the fact that that problem makes their car less safe is an actionable set of facts under the UCL, and I think that's very analogous to what we have here. Consider, for example, other analogies. You have a child bike helmet that is claimed to be safe, but it's not safe for whatever reason. You have a handful of children who have accidents and break their skulls, but you have most children who don't. They still have a claim that there was a misrepresentation, and that is something that the California legislature, affirmed by the California people in Proposition 64, affirmed by the high court several times in Tobacco and Kwikset, deems a valuable public interest to ensure honesty in the marketplace. You might have a bulletproof vest that makes allegations about safety or makes claims about safety and isn't adequately safe. What its claims are and what it claims to be and how far short of that it falls, that's a fact question under Rubio, under Haskell, and these other cases. Well, the only problem that I have, and I guess we've already discussed that, is that it seems easy in a negligence case or a breach of warranty case or even a failure to warn case, not quite so easy, even with this guideline, if you meet the guideline, to suggest that it is a misrepresentation. I think the problem there, Your Honor, is that you're blending failure to state a claim with preemption. And if we look at the preemption analysis, there's no requirement it's not satisfied. If we look at failure to state a claim, it's not a question of what does an FDA bureaucrat think. It's not a question of what does an expert microbiologist think. It's a question of what the reasonable consumer thinks. So under Gerber, Freeman v. Time, Haskell v. Time, there's a question of what do people in the public reasonably think. And that's rarely appropriate. The courts have repeated it. This Court has said it, and other courts have said it. It's rarely appropriate for a motion to dismiss because it's a fact question. In Rubio, for example, the Court relied that there was a question of what does the term fixed mean, a fixed APR. We all know, most of us know that a fixed APR is different from a variable APR. It might change, but it's fixed in the sense that it's not variable. Well, the claim succeeded precisely on the reasonable consumer's interpretation that fixed means fixed forever. And the way the Court could have confidence in that was because it referred to the Federal Reserve's investigation in focus groups with customers akin to doing customer surveys of what do they think disinfect, rejuvenate, supports healthy eyewear, lenswear means. They actually dug into the question of what does it mean on the ground to people. And so I think to find that there's no claim here or to find that there's no standing would have dramatic repercussions in terms of undermining what the Supreme Court has said in Kwikset and tobacco and what the people have said in saying we think the California market requires honesty at perhaps a higher level than other states require. But we think that that protects consumers and it protects competitors and it maintains the integrity of our marketplace in terms of honesty. Thank you for your argument. Thank you, Your Honor. Case 10-15222, Degelman v. Advanced Medical Optics is now submitted.
judges: Collins, Noonan, Smith N. R.